UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| ALEJANDRO ESTEVIS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 5:22-cv-22 |
| CITY OF LAREDO, IGNACIO CANTU, | § | |
| and EDUARDO GUAJARDO, in their | § | |
| individual capacities. | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S COMPLAINT

Plaintiff Alejandro Estevis brings this complaint to show that Defendants City of Laredo, Ignacio Cantu, and Eduardo Guajardo violated his rights pursuant to 42 U.S.C § 1983 and the Fourth and Fourteenth Amendments by inflicting excessive force upon him and will show as follows:

### I.    Parties

1.    Alejandro Estevis is a resident of Webb County.

2.    The City of Laredo is a Texas municipality, and operates the Laredo Police Department. It may be served through its City Manager, Robert Eads, at 1110 Houston St., Laredo, TX 78040. Service is hereby requested.

3.    Ignacio Cantu is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Cantu was acting under color of law as an officer of the Laredo Police Department. He may be served at Laredo Police Department, 4712 Mahler Ave., Laredo, TX 78041. Service is hereby requested.

4. Eduardo Guajardo is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Guajardo was acting under color of law as an officer of the Laredo Police Department. He may be served at Laredo Police Department, 4712 Mahler Ave., Laredo, TX 78041. Service is hereby requested.

## II. Jurisdiction and Venue

5. This Court has federal question jurisdiction over this 42 U.S.C. §§ 1983 & 1988 action pursuant to 28 U.S.C. §§ 1331 & 1343.

6. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1) as all relevant events occurred in this division, and all Defendants reside in this state.

## III. Facts

7. Laredo policer officers Ignacio Cantu and Eduardo Guajardo used excessive force against Plaintiff Alejandro Estevis.

### A. Defendants used excessive force by shooting Estevis.

8. In the early morning on April 9, 2020, Laredo police and other law enforcement pursued Alejandro Estevis as he drove a pickup truck.

9. Toward the conclusion of the chase, police laid down a controlled tire deflation device that successfully punctured and deflated the truck's tires.

10. From that point forward, Estevis' truck was physically unable to drive at high speeds due to its punctured tires and this fact was reported over the radio to all police involved, including Defendants.

11. To conclude the pursuit, officer Cantu forced the pickup to a stop by blinding Estevis using his vehicle's spotlight, then driving into Estevis' path while he was blinded by the spotlight.

12.     Estevis' truck came to a stop against Defendant Cantu's police vehicle, which initially sat to the front and left of the truck.

13.     The officers believed Estevis was distraught and a suicide risk.

14.     The officers knew Estevis was unarmed.

15.     Defendant Guajardo positioned his police SUV to block the truck from reversing, as Guajardo stopped his SUV at the truck's rear left corner.

16.     All three vehicles—Cantu's police sedan, Guajardo's police SUV, and Estevis' pickup truck—were facing diagonally toward the right side of the road, so that the truck was barricaded from continuing forward by the diagonally facing pair of police vehicles on the driver's side and a chain link fence off the roadway on the truck's passenger side.

17.     Shortly after it was forced to stop, Estevis' truck, in reverse, pushed against Guajardo's parked SUV, but then stopped again, incapable of moving the SUV.

18.     After the point in time that the truck pushed against the police SUV and the truck stopped, Estevis made no movements that were, or could reasonably be interpreted to be, any kind of threat to the officers or anyone else.

19.     Cantu exited his police vehicle with his pistol drawn, standing to the driver's side of his own vehicle, which was in turn to the driver's side of Estevis' truck.

20.     Guajardo likewise exited his police SUV and stood to the driver's side of his own police SUV, which was on the driver's side and rear of Estevis' truck.

21.     About ten seconds after the truck had stopped, Estevis' truck began to move forward.

22.     At that moment, both Guajardo and Cantu were still to the driver's side of the truck, with their own stopped police vehicles in between themselves and the truck.

3

23. There was no path for the truck to conceivably maneuver into the officers or anyone else.

24. The only thing in front of the truck was the side of the road and a chain link fence.

25. Although the truck was moving forward, even if it would have reversed instead, the officers had just witnessed that the truck (with its shredded tires) was unable to move in reverse due to the parked police SUV blocking it from behind.

26. Nonetheless, one or both officers[1] fired a total of three times into Estevis' truck as it moved forward: away from them, their vehicles, and the road.

27. The truck harmlessly hit the chain link fence and stopped within three seconds.

28. On information and belief, the three vehicles were in these positions when the truck came to rest against the fence (although the truck's driver side door was closed):[2]



29. The officers took several steps toward the truck, with Cantu's police vehicle remaining in between the officers and the truck.

30. Still positioned on the truck's driver side, the officers waited three more seconds.

31. The officers then fired six more shots at Estevis while the truck was stopped.

32. Cantu fired three total times at Estevis.

---

[1] In the alternative, Plaintiff alleges that Guajardo fired the first three shots.

[2] Plaintiff's allegation is limited to the three vehicles in the foreground of the photograph.

33.     Guajardo fired six total times at Estevis.

34.     Neither officer issued any commands during the six seconds between their firing the first set of three shots and their firing the second set of six shots.

35.     The officers' shots hit Estevis multiple times, including in the wrist and in the back.

36.     Several of the officers' other shots hit the truck's driver side door, and another hit the truck's dashboard.

37.     The officers approached Estevis, who was now visibly bleeding.

38.     Both of Estevis' hands were visible and empty, and he complied with officers' commands.

39.     Instead of helping Estevis, the officers laughed at him.

40.     Eventually an ambulance arrived and took Estevis to a hospital.

41.     Estevis survived, but suffered permanent injuries.

### B. Laredo and Laredo Police Department Encourage Excessive Force.

42.     Neither Cantu nor Guajardo has been disciplined in any way for shooting Estevis.

43.     At all relevant times, the policymaker for the City of Laredo's policing functions was the police chief of the Laredo Police Department.

44.     On information and belief, numerous similar incidents before and after this incident were known to the police chief, and any other Laredo policymakers, putting them on notice of these deficient policies, customs, and practices, and the need for corrective action.

45.     Among these incidents, the following were certainly known to the police chief and other City leadership.

46.     Jose Mungia, June 13, 2003 – LPD officer Jose Sotelo arrived to a domestic violence call. When he approached Mungia, Mungia reacted angrily and placed a knife to his own

5

neck. According to an eye-witness, Sotelo then shot Mungia twice, killing him. In an ensuing lawsuit by Mungia's family, the United States District Court for the Southern District of Texas, Judge George Kazen, denied the officer's motion for summary judgment on April 18, 2006. The City and the officer paid the family $130,000 to settle the matter.

47.     Roberto Adams, January 15, 2007 – After a vehicle pursuit, Adams was forced to a stop by Laredo police. Adams attested that LPD officers Juan Rodriguez, Abraham de la Garza, and others pulled Adams from the truck, smashed Adams in the head, forcibly turned him face down, cursed at him, then punched and kicked him over twenty times while he laid helpless on the ground. After the officers were satisfied with the beating, they dragged Adams through the mud and drove him to the hospital. There, the officers learned Adams' aberrant driving that precipitated the pursuit had been due to diabetic hypoglycemia. Of the six officers involved in the incident, four had seven total prior complaints for excessive force. The United States District Court for the Southern District of Texas, Judge George Kazen, denied the officers' and the City's motion for summary judgment on the excessive force claims and a failure to supervise claim on May 19, 2011. Shortly afterward, the City paid Adams to settle his claims.

48.     Ramiro Gonzalez, September 5, 2008 – LPD officers Juan Rivera and Jorge Perez approached a truck that they suspected was being used to deal drugs. Neither Rivera nor Perez were wearing police uniforms or carrying badges, but they drew their weapons and tried to detain the people in the truck. After a struggle, the driver of the truck, Gonzalez, reversed to flee. Rivera fired—trying to hit the driver through the windshield as the truck drove in reverse away from the officers. Rivera missed. LPD decided the shooting was justified and did not discipline either officer.

49. Amador Chapa-Rodriguez, April 6, 2009 – LPD Sergeant Hector Garcia engaged in a high-speed vehicle chase of Chapa. The chase concluded when Chapa lost control of the vehicle, causing it to collide with a different officer's vehicle. Garcia stopped, exited his own vehicle, and opened fire on the truck's driver side window. Garcia falsely claimed he shot at Chapa because he was in danger of being run over—even though, as LPD itself determined, Garcia was never in front of the truck. Indeed, *after* opening fire, Garcia chose to take cover behind the truck. Luckily, Garcia missed all five shots. After Chapa was forced out of the vehicle and onto the ground, Officer Rene Gonzalez kicked him repeatedly even though he was on the ground. Chapa was unarmed. Even though LPD, including the police chief, was aware of this misconduct and knew that both officers' justifications conflicted with the facts, they did not discipline either officer.

50. Laura Sofia Gutierrez, David Gutierrez, and Roberto Rodriguez, May 7, 2010 – LPD officer Cesar Benavides participated in an illegal search of Laura Sofia Gutierrez's house. During the search, the officers brandished firearms at the peaceful occupants of the home, forcibly dragged one of the innocent occupants out of the house, and beat the innocent occupants even though they did not resist. The officers then refused to provide medical help to their victims. During an ensuing lawsuit, the family alleged that LPD was adhering to a "cone of silence" that promoted excessive force. Benavides had not been disciplined despite numerous excessive force complaints where LPD exonerated him; the family alleged those investigations were stymied by the "cone of silence." The United States District Court, Magistrate Judge Scott Hacker, denied the City of Laredo's motion to quash a subpoena for documents about the "cone of silence" on October 4, 2013. Within months, the lawsuit settled.

51.     Martin De Jesus Rocha and Maria Gloria Valdez, May 26, 2012 – LPD officer Frank Carter opened fire on Valdez and Rocha when they refused to exit their vehicle and drove away from the scene, having committed no crime or engaged in any suspicion activity. Carter fired multiple shots from behind. He lied, claiming the vehicle tried to run him over. After Carter's false report went out, the pair were pulled over by other officers based on Carter's lie. After they were detained and handcuffed inside a police vehicle by six other LPD officers, those officers allowed Carter to enter the vehicle where Rocha and Valdez were handcuffed. Carter punched them both repeatedly while they were helpless and posed no threat. One bystander officer, Enrique Granados, intentionally disabled a camera to try to cover up Carter's excessive force, and falsely denied witnessing the assault. A second bystander officer, Alberto Ochoa, similarly witnessed the misconduct and attempted to turn off a camera to prevent the beating from being recorded. The third and fourth bystander officers, Ruben Yanez and Gerardo Jalomo, stood by and watched from outside the vehicle while they could see Carter beating the helpless prisoners. A fifth bystander officer, Priscilla Smith-Hernandez, and a sixth bystander officer, Christopher Martinez, intentionally tried to stand in front of a camera to block it recording the beating. Smith-Hernandez also lied about her motives to investigators. Carter resigned as a result, and pleaded guilty to violating 18 U.S.C. 242. Rocha and Valdez filed a lawsuit against the City and Carter, but soon after dismissed it by agreement.

52.     Austin Flores, June 30, 2013 – While involved in a low-speed police vehicle chase of Flores, whom he knew to be suicidal, Officer Richard Garza intentionally fired seven times at Flores' vehicle after it had passed him on the road. After Flores crashed his own vehicle and came to a stop, Garza fired twice more, claiming he saw the vehicle rolling back into the road. Luckily, no one was injured by Garza's shooting. After the driver was detained, Garza smashed a window

8

on Flores' vehicle. LPD, including the police chief, determined the shooting was unjustified, but only gave Garza a five-day suspension.

53. Cesar Cuellar, Jr., November 9, 2015 – Officer Priscilla Hernandez, responding to a request to check welfare due to an alleged attempted suicide, entered Cuellar's apartment without knocking or announcing herself as a police officer. Cuellar was a Sheriff's deputy. Hernandez called out asking if he needed assistance, and Cuellar yelled back from his bedroom to leave the apartment. Hernandez then asked if he had any weapons; Cuellar said yes. Hernandez ordered Cuellar to come out, put the weapon down, and show his hands. Cuellar proceeded from the bedroom, but did not drop the weapon immediately, keeping the weapon at his side for about twelve seconds. Hernandez then shot him twice, killing him. The United States District Court for the Southern District of Texas, Judge Diana Saldaña, held that a genuine issue of material fact existed as to whether Hernandez used unconstitutional excessive force—however, Judge Saldaña also concluded that the constitutional right had not been clearly established in 2015 with sufficient particularity, so dismissed the excessive force claims by Cuellar's survivors on September 16, 2019.

### IV. Causes of Action

**A. FOURTH AND FOURTEENTH AMENDMENTS: EXCESSIVE FORCE**
**(AS TO DEFENDANTS IGNACIO CANTU AND EDUARDO GUAJARDO)**

54. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

55. Defendants Cantu and Guajardo,[3] who were acting under color of law, shot at Estevis three times when he posed no threat of serious bodily injury or death to anyone, as Estevis'

---

[3] In the alternative, Plaintiff alleges that Guajardo fired the first three shots.

truck was moving away from the officers and towards a chain link fence.

56. Then, several second later, both Defendants Cantu and Guajardo inexplicably fired six more times at Estevis after his truck had crashed into the chain link fence, was not moving, and when Estevis posed no conceivable threat to anyone.

57. Each sequence of shots—the three-shot sequence when the truck was moving forward and the six-shot sequence when the truck was stopped—was independently unjustified and objectively unreasonable.

58. Cantu and Guajardo's actions grievously injured Estevis, as Estevis was struck multiple times by bullets fired by Cantu, Guajardo, or both, during one or both of these sequences of shots.

59. As a consequence, Cantu's and Guajardo's use of force against Estevis was clearly excessive to the need, objectively unreasonable in light of established law, and directly caused his serious injuries. Therefore, Cantu's and Guajardo's actions violated Estevis' Fourth and Fourteenth Amendment rights to be free from excessive force and an unreasonable seizure.

60. As a direct and proximate result of Cantu's and Guajardo's actions, Estevis was seriously injured and impaired.

61. Accordingly, Defendants Cantu and Guajardo are liable for compensatory and punitive damages under 42 U.S.C. § 1983.

**B. FOURTH AND FOURTEENTH AMENDMENTS – POLICIES, PRACTICES, AND CUSTOMS THAT WERE THE MOVING FORCE FOR CONSTITUTIONAL VIOLATIONS (AS TO DEFENDANT CITY OF LAREDO)**

62. Plaintiff incorporates by reference the foregoing and further alleges as follows:

63. The City of Laredo had the following policies and/or practices in place when Defendant Cantu and Guajardo ruthlessly shot Estevis:

- Dispatching inadequately trained or screened officers to life and death crisis situations;
- Dispatching inadequately trained or screened officers to mental health crisis calls;
- Failing to adequately supervise officers during police vehicle pursuits;
- Failing to train officers concerning alternatives to the use of deadly force;
- Failing to train officers to de-escalate encounters involving a mental health crisis rather than resort to deadly force;
- Failing to train officers to de-escalate encounters involving a subject in a vehicle;
- Adhering to a cone of silence to protect officers who engage in excessive force;
- Tolerating false reports by officers to protect themselves and other officers who engage in excessive force;
- Using excessive deadly force;
- Shooting at non-dangerous occupants of vehicles; and
- Failing to change practices following wrongful shootings or train officers about known wrongful shootings.

64. Each of the policies delineated above was actually known, constructively known and/or ratified by the City of Laredo and its policymakers and was promulgated with deliberate indifference to Estevis' Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that City of Laredo police officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

65. Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

## V.  Damages

66. Plaintiff Estevis seeks the following damages:

    a. Past lost wages;

    b. Past and future loss of earning capacity;

c. Past and future pain and suffering;

d. Past and future mental anguish;

e. Past and future medical expenses;

f. Past and future impairment;

g. Past and future disfigurement;

h. Past and future loss of capacity for enjoyment of life;

i. Past and future disability;

j. Attorneys' fees and expenses, including expert fees, for this civil action pursuant to 42 U.S.C. § 1988;

k. Pre-judgement and post-judgement interest at the highest rates allowable under the law;

l. All other compensatory and/or general damages to which he is entitled under state or federal law; and,

m. Punitive damages in the highest amount allowed by law, as to Defendants Cantu and Guajardo only.

## VI.  Jury Demand

67. Plaintiff respectfully requests a trial by jury.

## VII.  Prayer for Relief

68. To right this grave injustice, Plaintiff requests that this Court:

a. Award compensatory damages to the Plaintiff, against all Defendants, jointly and severally;

b. Award punitive damages to the Plaintiff, against Defendants Cantu and Guajardo only;

c. Award Plaintiff costs, including expert fees and attorney's fees, pursuant to 42 U.S.C. § 1988;

d. Award pre-judgement and post-judgement interest at the highest rate allowable under the law; and,

e. Award and grant such other relief as the court deems proper.

Dated: April 4, 2022.

Respectfully submitted,

**EDWARDS LAW**
703 West 17h Street
Austin, Texas 78701
Tel. 512-623-7727
Fax. 512-623-7729

By      /s/ Jeff Edwards
      JEFF EDWARDS
      State Bar No. 24014406
      jeff@edwards-law.com
      MIKE SINGLEY
      State Bar No. 00794642
      mike@edwards-law.com
      DAVID JAMES
      State Bar No. 24092572
      david@edwards-law.com

**JOHN T. FLOOD, L.L.P.**
802 N. Carancahua St., Ste. 900
Corpus Christi, Texas 78401
Tel. 361-654-8877
Fax. 371-654-8879

By      /s/ John Flood
      JOHN FLOOD
      State Bar No. 07155910
      john@floodtriallawyers.com
      irma@floodtriallawyers.com

**GOWAN ELIZONDO LLP**
555 N. Carancahua St., Ste. 1400
Corpus Christi, Texas 78401
Tel. 361-651-1000
Fax. 361-651-1001

By      /s/ Luis "L.A." Elizondo
      Luis "L.A." Elizondo
      State Bar No. 06521550
      lelizondo@gelawfirm.com

**ATTORNEYS FOR PLAINTIFF**