United States District Court
Southern District of Texas
**ENTERED**
March 27, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| ALEJANDRO ESTEVIS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:22-CV-22 |
| | § | |
| CITY OF LAREDO, *et al.* | § | |

# ORDER

On April 9, 2020, at 5:18 a.m., Laredo Police Department ("LPD") officers shot Plaintiff Alejandro Estevis after he led them on a two-hour car chase, rendering him wheelchair-bound, likely for life (Dkt. No. 66-30 at 10–12). Mr. Estevis sued Officers Eduardo Guajardo and Ignacio Cantu, who both shot at him, alleging that the shooting was an unconstitutionally excessive use of force under 42 U.S.C. § 1983 (Dkt. No. 29 at 13–14). The officers raised a qualified immunity defense in their answer to the complaint (Dkt. No. 31 at 3). Mr. Estevis also sued the City of Laredo, alleging that the City's policies, practices, and customs caused the officers to engage in excessive force when they shot him (Dkt. No. 29 at 14–15).

The officers and the City of Laredo filed the pending motion for summary judgment (Dkt. No. 54), to which Mr. Estevis filed a timely response (Dkt. No. 66). The officers and the City filed a timely reply (Dkt. No. 70), and Mr. Estevis filed a sur-reply with leave of the Court (Dkt. Nos. 71, 72) The Court has carefully reviewed the parties' filings and applicable caselaw.

For the reasons that follow, the officers' motion for summary judgment (Dkt. No. 54) is **GRANTED IN PART** as to the first three but **DENIED IN PART** as to

1

the last six of the nine shots they fired at Mr. Estevis. Construing the facts in Mr. Estevis' favor, as required at summary judgment, the officers here violated clearly established law when they shot at Mr. Estevis' disabled truck after it drove away from them into a fence (*see* Dkt. No. 66-3 at 5:18:40–50). *See Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023) (for summary judgment standard) (citation omitted).

As for Mr. Estevis' claims against the City of Laredo (Dkt. No. 29 at 14–16), the Court **GRANTS** the City's motion for summary judgment (Dkt. No. 54 at 12) in its entirety. Mr. Estevis fails to clear the high bar for municipal liability claims—he cannot point to anything facially wrong with the City's use of force policy, and has not established a pattern or practice of LPD officers unconstitutionally shooting drivers. His failure to train and supervise and ratification claims are also insufficient to raise a genuine dispute of material fact.

## I.    FACTUAL BACKGROUND

On April 9, 2020, at around 3:19 a.m., LPD Officer Karla Pruneda observed Alejandro Estevis slumped over in the driver's seat of his truck and attempted to perform a welfare check (Dkt. No. 66-18 at 10). When Mr. Estevis woke up, he drove off and officers pursued him for two hours, at times traveling over 100 miles per hour (*id.*; Dkt. Nos. 54 at 10; 55-5 at 9; 66-18 at 10–11). At no point in the chase did officers uncover any evidence that Mr. Estevis was armed (Dkt. No. 55-4 at 22).

Sergeant Alonzo Olivarez ordered officers to terminate the pursuit at 3:21 a.m., and again at 3:55 a.m. "after observing multiple officers driving at a high rate of speed and on the wrong side of the street" (Dkt. No. 66-17 at 4). Although some officers

discontinued the chase, "several officers . . . continued to pursue the vehicle," including Defendant Officer Eduardo Guajardo (*id*. at 5; Dkt. No. 66-18 at 11).

At approximately 4:38 a.m., Lieutenant Rolando Chavez[1] again ordered officers to terminate the chase because it was progressing away from Laredo city limits (Dkt. No. 66-18 at 11). Officer Guajardo disobeyed this order as well (*id*.). The LPD investigation found that "[Officer Guajardo's] decision to not abide by directives and orders enabled other officers to continue following [Mr. Estevis]" (*id*.). The LPD found that the officers were "govern[ing] themselves, which contributed to mass confusion" (Dkt. No. 66-17 at 5). As for Defendant Officer Ignacio Cantu, he kept to his assigned beat area and did not join the chase until it neared him shortly after 4:51 a.m. (Dkt. No. 66-19 at 8–9). Notably, by that point, Lieutenant Chavez had already canceled the pursuit (*id*. at 8). LPD later disciplined Officers Guajardo and Cantu for disobeying the commands of their superiors to stop pursuing Mr. Estevis (*see* Dkt. Nos. 66-18; 66-19).

Multiple times during the chase, law enforcement officers deployed "spike strips," tire-deflation devices, on the road to stop Mr. Estevis (Dkt. Nos. 55-7 at 3; 66-14 at 29). While United States Border Patrol Agent Marco Solis and Texas Department of Public Safety Trooper Armando Baldazo were laying spike strips, Mr. Estevis drove at them (Dkt. No. 55-7 at 3).[2] He was later indicted for this conduct and

---

[1] For reference, ranking in the LPD, from lowest to top of the hierarchy, is as follows: officer, investigator, sergeant, lieutenant, captain, and chief (Dkt. No. 55-2 at 14). So, Lieutenant Chavez outranked Sergeant Olivarez and all of the officers involved in the chase.

[2] Officer Guajardo said that he was aware of this incident in his deposition, but that is disputed (Dkt. No. 55-2 at 13–14). It appears Officer Cantu was not aware that Mr. Estevis drove at the other officers. He was asked in his deposition, "you didn't have evidence that [Mr. Estevis] had engaged in a violent crime, correct?" (Dkt. No. 55-3 at 10). To which he responded, "[c]orrect" (*id*.).

pleaded guilty to aggravated assault of Agent Solis and evading arrest, receiving a sentence of 10 years' probation (Dkt. Nos. 55-5 at 11; 55-8 at 5, 15).

Using the spike strips at 4:45 a.m. and 5:11 a.m., officers successfully deflated all four of Mr. Estevis' truck's tires, wearing one down to the rim (Dkt. Nos. 55-2 at 16; 55-7 at 3, 8; 66-19). After that point, the chase slowed to a crawl (*see, e.g.,* Dkt. No. 66-5 at 5:16:07–5:18:28). Officers followed Mr. Estevis' truck at about three to five miles per hour (*see id.*; Dkt. Nos. 54 at 9; 55-7 at 4). While the chase continued at this slow speed, Officer Gustavo Rodriguez pulled up alongside Mr. Estevis to talk to him (Dkt. No. 55-7 at 4). Mr. Estevis said he had lost his family and falsely claimed that he had COVID (Dkt. Nos. 55-5 at 11; 66-14 at 26; 66-16 at 8).

Around 5:16 a.m., Sergeant Ricardo Lozano asked if any officer was driving an older car, and Officer Cantu said he was (Dkt. No. 66-19 at 9). Sergeant Lozano directed Officer Cantu to slowly position his car in front of Mr. Estevis' truck and box him in from the front so officers could conduct a felony stop (*id.*; Dkt. No. 55-7 at 38).

However, Officer Cantu apparently misunderstood Sergeant Lozano's directive[3], because at 5:18 a.m., instead of pulling in front of Mr. Estevis' truck, he rammed it and drove it off the road towards a fence (*see, e.g.*, Dkt. No. 66-4 at 5:18:20–33). LPD does not practice this pursuit intervention tactic, and Officer Cantu had not been trained to perform it (Dkt. No. 66-19 at 9). LPD later disciplined Officer Cantu for executing this unauthorized tactic, finding that he "erroneously operate[d] [his] patrol car in an unsafe manner" (*id.* at 9–10).

---

[3] Officer Cantu acknowledged in the internal LPD investigation that he was uncertain about the command (Dkt. No. 66-19 at 9).

After Officer Cantu drove Mr. Estevis off the road, Officer Guajardo positioned his squad car behind Mr. Estevis' truck (Dkt. No. 66-4 at 5:18:33). Other officers engaged in the pursuit stopped their cars towards the passenger and rear sides of Mr. Estevis' truck, boxing him in (Dkt. No. 66-93 at 5:18:20–33). Mr. Estevis then reversed his truck into Officer Guajardo's car (Dkt. No. 66-4 at 5:18:33–39). Officer Guajardo had exited his car seconds before this collision and pointed his gun at Mr. Estevis' truck (Dkt. Nos. 66-2 at 5:18:34–37; 66-5 at 5:18:33–36).

After reversing into Officer Guajardo's car, Mr. Estevis began to drive forward, towards the fence off the side of the road, away from all the officers (Dkt. No. 66-4 at 5:18:40). At this point, Officer Guajardo fired three shots at Mr. Estevis ("shots 1–3") (Dkt. Nos. 66-2 at 5:18:40–41; 66-22). A couple of seconds later, Mr. Estevis' truck hit the fence and stopped in the grass (Dkt. No. 66-4 at 5:18:41–44). After hitting the fence, Mr. Estevis revved the truck engine and the truck's wheels spun in the grass, but the truck did not move (Dkt. No. 66-7 at 5:23:00–04).[4] No officers were immediately behind the truck (see Dkt. No. 66-93 at 5:18:40–50).

For about five seconds, Officer Guajardo advanced on Mr. Estevis' stalled truck from the side with his gun drawn, and took careful aim (Dkt. Nos. 66-2 at 5:18:40–46; 66-5 at 5:18:40–46). Mr. Estevis stopped revving the engine, and a second later Officer Guajardo fired three more shots at Mr. Estevis ("shots 4–6") (Dkt. Nos. 66-2 at 5:18:46–47; 66-22). Officer Guajardo fired shots 4–6 six seconds after shots 1–3.

---

[4] Regarding the cited timestamp, Officer Cantu's dashboard camera appears to display the incorrect timestamp, showing a time several minutes later than any of the other videos. His dashboard camera displays the truck stalling in the grass at the cited timestamp, although according to the timestamps in the other videos this event apparently occurred at approximately 5:18:44.

Two seconds later, Officer Cantu fired three more shots ("shots 7–9"), the last shots any officer fired at Mr. Estevis (Dkt. Nos. 66-3 at 5:18:48–49; 66-24). Some of the officers' shots struck Mr. Estevis, and he made no further effort to move the truck (*see* Dkt. Nos. 66-2 at 5:18:50–5:19:10; 66-12 at 20 (noting that Mr. Estevis was struck by bullets in his left upper back and left wrist)).

When the officers fired shots 4–9, they stood several feet away from the driver's side of Mr. Estevis' truck, with Officer Cantu's car positioned between them and the truck (*see* Dkt. No. 66-3 at 5:18:41–50). Officer Guajardo appears to have stood at least ten feet away from the truck when he fired shots 4–6 (*see id.* at 5:18:46–47). And it appears that Officer Cantu was at least fifteen feet away from Mr. Estevis when he fired shots 7–9 (*see id.* at 5:18:48–49). By this time, other officers on the scene had taken cover behind their police cars, towards the truck's passenger and rear sides (*see* Dkt. No. 66-93 at 5:18:40–50).

After the shooting, officers apprehended Mr. Estevis and took him to the hospital (Dkt. Nos. 29 at 5; 54 at 9). Bullet fragments in his spine have rendered him bound to a wheelchair, likely for life (*see* Dkt. Nos. 66 at 16; 66-13 at 9 ("the bullet lodg[ed] in his upper thoracic spine [left] him paraplegic . . . [A]t Brook Army Medical Center in San Antonio . . . he was told that spinal surgery to remove the bullet fragments was not an option, as he was high risk to end up quadriplegic."[5])).

---

[5] These statements come from Dr. John J. Park's assessment of Mr. Estevis three years after the shooting (Dkt. No. 66-13). Dr. Park, a neurosurgeon, concluded that "surgery is still not an option, as surgery would only carry significant risks without providing any benefits. Mr. Estevis is already 3 years out from his injury, and there is no chance that surgery would allow for restoration of left lower extremity function" (*id.* at 10).

*Photographs*:

Here is a photograph of Mr. Estevis' truck in its resting position against the fence (*see* Dkt. No. 29 at 4). The photograph was taken after the shooting, but the vehicles are positioned roughly as they were when the officers fired shots 4–9 (*id.*):



And here is a still taken from Officer Cantu's body-worn camera just before he fired shots 7–9 (Dkt. No. 66-3 at 5:18:48). Pictured is Officer Guajardo, who had just fired shots 4–6 (*id.* at 5:18:46–47). As the still shows, both officers were several feet away from the driver's side of Mr. Estevis' truck when they fired:



Here are the positions of other officers on scene when Mr. Estevis reversed into Officer Guajardo's car (*see* Dkt. No. 66-93 at 5:18:35). The officer pictured near the truck's rear, apparently Officer Rodriguez, seems to have been as close as any officer got to the truck while it was mobile. It is not clear whether Officers Guajardo or Cantu saw Officer Rodriguez at this moment:



A few seconds later, Officer Rodriguez takes cover behind his car door, as Mr. Estevis reverses into Officer Guajardo's car. Thus, all the other officers appear to have taken cover at least eight seconds before shots 4–9:[6]



---

[6] The timestamp in the top-right of the still reads 5:18:38. Officer Guajardo fired shots 1–3 at 5:18:40 (Dkt. Nos. 66-2 at 5:18:40–41; 66-22). He then fired shots 4–6 at 5:18:46, and Officer Cantu fired shots 7–9 at 5:18:48 (Dkt. Nos. 66-2 at 5:18:46–47; 66-3 at 5:18:48–49; 66-22; 66-24). So, two seconds elapsed between this still and shots 1–3, eight seconds elapsed between this still and shots 4–6, and ten seconds elapsed between this still and shots 7–9.

## II.   DISPUTED FACTS

When ruling on a motion for summary judgment, a district court should set out the "factual scenario it believes emerges from viewing the summary judgment evidence in the light most favorable to [the plaintiff]." *White v. Balderama I*, 153 F.3d 237, 240–42 (5th Cir. 1998); *see also Castillo v. City of Welasco*, 369 F.3d 504, 507. This is necessary so that, if a party appeals the district court's ruling, the appellate court can "determine whether the defendant's version of the facts viewed in the light most favorable to the plaintiff mirrors the district court's version of the facts viewed in the light most favorable to the plaintiff." *Balderama*, 153 F.3d at 240 (quoting *Colston v. Barnhart*, 146 F.3d 282, 285–86 (5th Cir. 1998)). That makes it possible for the appellate court to determine whether the appellant is properly challenging the materiality of fact issues as opposed to improperly challenging their genuineness. *Id.*

Here, the parties dispute several facts about the events surrounding the shooting of Mr. Estevis:

- The officers claim that Mr. Estevis drove into Officer Cantu's car, while Mr. Estevis claims that Officer Cantu drove him off the road (*compare* Dkt. No. 54 at 9 *with* Dkt. No. 66 at 11).
- The officers claim that Mr. Estevis was revving the truck's engine and that the truck's wheels were spinning when Officers Guajardo and Cantu fired shots 4–9 (Dkt. No. 54 at 9–10). Mr. Estevis says that the engine stopped revving and the wheels stopped spinning before the officers fired shots 4–9 (Dkt. No. 66 at 14–15).
- Officer Guajardo claimed in his deposition that he heard over the radio that Mr. Estevis drove his truck at "some of the DPS or border patrol agents that were trying to spike the truck" (Dkt. No. 55-2 at 14). Mr. Estevis, meanwhile, says that Officers Guajardo and Cantu did not witness Mr. Estevis' assault on Agent Solis and alleged assault on Trooper Baldazo, and that the record of radio traffic reflects that nothing about the assault was transmitted to LPD officers until after Mr. Estevis was shot (Dkt. No. 66 at 10).

Viewing the facts in the light most favorable to the Plaintiff, the Court finds Mr. Estevis' version of these facts to be credible. Defendants cite *Scott v. Harris* for the proposition that "the Court does not consider a party's description of facts that is so blatantly contradicted by video evidence that 'no reasonable jury could believe it'" (Dkt. No. 54 at 11) (citing 550 U.S. 372, 380 (2007)). However, the video evidence in this case cuts against Defendants' version of the facts.

First, as to Officer Cantu driving Mr. Estevis off the road, Defendants claim that "Defendant Officer Cantu, obeying Sergeant Lozano's command positioned his vehicle in front of the fleeing suspect. As Officer Cantu executed the command, the Estevis vehicle collided with Officer Cantu's patrol vehicle and both vehicles moved off the side of the roadway" (Dkt. No. 54 at 9).[7]

But the video evidence clearly shows that prior to impact, Officer Cantu accelerated alongside Mr. Estevis' truck, swerved his car to the right and into the front left side of the truck, and drove it off the road (*see* Dkt. Nos. 66-4 at 5:18:20–33; 66-5 at 5:18:20–33). Indeed, LPD's Office of Professional Standards' Investigative Summary, which recommended discipline against Officer Cantu for performing the unauthorized maneuver, found that "most importantly, Sergeant Lozano ordered Officer Cantu to park the vehicle in front of the vehicle, but instead Officer Cantu rammed the suspect" (Dkt. No. 55-7 at 15) (cleaned up).[8] Defendants' false claim that

---

[7] *See also* Dkt. Nos. 54 at 19 ("Estevis' vehicle struck Officer Cantu's Crown Victoria"); 70 at 12 ("[a]s the pursuit came to a conclusion, Plaintiff Estevis' vehicle made contact with Officer Cantu's patrol vehicle and both vehicles went to the side of the roadway").

[8] *See also* Dkt. No. 66-17, LPD letter regarding Sergeant Alfredo Guerrero's discipline, at 5 ("The vehicle eventually came to a complete stop after being pushed off the road by a pursuing officer"); Dkt.

Mr. Estevis collided with Officer Cantu as Officer Cantu attempted to position his car in front of the truck is not only wrong; it is likely sanctionable. *See* Fed. R. Civ. P. 11.

Second, the video and audio demonstrate that Mr. Estevis' truck engine stopped revving at 5:18:45, one second before Officer Guajardo fired shots 4–6 at 5:18:46, and three seconds before Officer Cantu fired shots 7–9 at 5:18:48 (*see* Dkt. Nos. 66-2 at 5:18:42–49; 66-3 at 5:18:42–49; 66-7 at 5:23:00–10).[9] While this is a short timeframe, it nevertheless supports Mr. Estevis' assertion that the truck engine had stopped revving, and the wheels had stopped spinning, when the officers fired shots 4–9 (Dkt. No. 66 at 14–15). The Court therefore adopts this version of the facts, rather than Defendants' claim that Mr. Estevis was "continually reeving [*sic*] his engine [and] spinning his tires" at the time of the shooting (Dkt. No. 54 at 9).

Third, as to whether Officer Guajardo was aware of Mr. Estevis' assaultive conduct towards Agent Solis and Trooper Baldazo, it is notable that nowhere in their motion for summary judgment or their reply in support of the motion do Defendants allege that Officer Guajardo was aware of this conduct. The LPD narrative report, which documented live text updates made during the chase, states that Mr. Estevis' vehicle was "GOING TOWRADS [*sic*] [BORDER PATROL] MIGHT SHOOT AT VEH[ICLE]" (Dkt. No. 66-16 at 8). But reviewing the narrative report in conjunction with the radio

No. 55-2, Officer Guajardo Deposition, at 17 ("Q . . . Officer Cantu swerve[d] his vehicle into the pickup, correct? A. Yes."); Dkt. No. 55-7 at 38 ("During his interview with Internal Affairs, Sgt Lozano indicated that his order did not authorize Officer Cantu to 'ram the suspect's vehicle,' which is what he believes Officer Cantu did.").

[9] As noted above, Officer Cantu's dashboard camera appears to display the incorrect timestamp, showing a timestamp at the time of the shooting which is several minutes later than any of the other videos. However, his dashboard camera nevertheless shows that the truck engine revved and its wheels spun for the last time roughly a second before Officer Guajardo fired shots 4–6 (Dkt. No. 66-7 at 5:23:04–07).

traffic at that point (Dkt. No. 66-28 at 1:47–2:11), it is ambiguous whether they signaled that Mr. Estevis was driving towards the Border Patrol agent, or rather towards the location where the Border Patrol agent had laid spike strips.

Because all evidence at summary judgment is to be viewed in the light most favorable to Mr. Estevis, the Court is compelled to find for purposes of this order, based on the radio traffic and text narrative, that Officer Guajardo was not aware of Mr. Estevis' assault on Agent Solis and Trooper Baldazo at the time of the shooting. And as discussed, Officer Cantu does not seem to have been aware of the incident— he testified in his deposition that he had no evidence during the chase that Mr. Estevis had engaged in a violent crime (Dkt. No. 55-3 at 10).

## III.   LEGAL STANDARDS

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A material fact is one that could "affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). And a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Courts view all evidence in the light most favorable to the nonmovant and draws all reasonable inferences in their favor. *Baker*, 68 F.4th at 244 (citing *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013)). But courts assign greater weight to "video recording[s] taken at the scene." *Id.* (citing *Betts v. Brennan*, 22 F.4th 577, 582

(5th Cir. 2022)). And after a government official invokes the defense of qualified immunity, the burden of proof shifts to the plaintiff, who must "rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

## IV.    DISCUSSION

### A. Claim Against Officer Defendants

Mr. Estevis alleges that Officers Cantu and Guajardo used excessive force in violation of the Fourth Amendment when they shot him (Dkt. No. 29 at 13–14). In response, the officers have invoked a qualified immunity defense (Dkt. No. 31 at 2–3). Thus, the Court must determine whether Mr. Estevis has overcome this defense.

"A court's decision on qualified immunity involves two questions: (1) whether the defendant violated the plaintiff's constitutional or statutory rights; and (2) whether those rights were clearly established at the time of the violation 'such that the officer was on notice of the unlawfulness of his or her conduct.'" *Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021) (quoting *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019)). "The second prong of the analysis 'is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citation omitted).

13

Courts are free to consider the two prongs of a qualified immunity defense in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the Court first considers whether the officers engaged in excessive force, viewing the facts in the light most favorable to Mr. Estevis. Then, the Court analyzes whether this conduct violated clearly established law.

     *i.  Excessive Force*

"To prevail on an excessive force claim, [the plaintiff] must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Marlbrough v. Stelly*, 814 F. App'x 798, 802–03 (5th Cir. 2020) (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)). "The reasonableness of the use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight.'" *Id.* at 803 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Courts consider the factors outlined by the Supreme Court in *Graham v. Connor* when evaluating whether force is excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *See Baker*, 68 F.4th at 247 (citing *Graham*, 490 U.S. at 396). Determining whether a use of force was excessive requires "a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake." *Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021).

14

When officials use deadly force against a fleeing suspect, the question is whether the suspect posed enough of a threat to justify the use of deadly force. *Lytle v. Bexar Cnty.*, 560 F.3d 404, 415 (5th Cir. 2009). "Common sense, and the law, tells us that a suspect is less of a threat when he is turning or moving away from the officer." *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021) (citations omitted); *see also Flores v. City of Palacios*, 381 F.3d 391, 399–400 (5th Cir. 2004) (upholding denial of summary judgment where, "most critically," officer shot suspect driver's car from behind). On the other hand, when a suspect drives directly at a police officer, that tends to justify the officer using deadly force to avert the threat. *See, e.g., Jackson v. Gautreaux*, 3 F.4th 182, 185, 187–88 (5th Cir. 2021) (deadly force reasonable where suspect was driving erratically with an officer stuck between the path of the suspect's car and a building).

### a. First *Graham* Factor

The Court begins its analysis here by taking account of the *Graham* factors. The first factor is the severity of the crime at issue. 490 U.S. at 396. Defendants contend that Mr. Estevis' two-hour flight throughout the city endangered "the lives, not only of the officers involved in the pursuit, but any other traffic on the roadway" (Dkt. No. 54 at 19). Notably, nowhere in their motion for summary judgment or their reply in support of the motion do Defendants allege that Officers Guajardo and Cantu were aware that Mr. Estevis drove his truck at Border Patrol Agent Solis or Texas Department of Public Safety Trooper Armando Baldazo. As discussed, the Court finds for purposes of this order that Officers Guajardo and Cantu were not aware of this

15

assaultive behavior. If they had been, the crime at issue would have been more severe than the car chase alone. Still, high-speed flight from officers is no doubt a serious crime and places the public at significant risk of harm. Therefore, the first *Graham* factor tilts in the officers' favor.

    b.  <u>Second *Graham* Factor</u>

The second *Graham* factor is whether the suspect poses an immediate threat to the safety of the officers or others. 490 U.S. at 396. In this respect, shots 1–3 here should be analyzed separately from shots 4–9. Officer Guajardo fired shots 1–3 immediately after Mr. Estevis reversed his truck into Officer Guajardo's car (*see* Dkt. Nos. 66-2 at 5:18:34–41; 66-22). The severely disabled truck barely budged Officer Guajardo's car (*see* Dkt. No. 66-4 at 5:18:35–40). However, the Court does not wish to play Monday morning quarterback—given the truck's collision with his car, Officer Guajardo could reasonably have perceived that the truck presented a serious enough threat of harm to justify shooting at it. *See Lytle*, 560 F.3d at 412 ("[I]f the facts were as [the officer] alleges—that is, he fired as or immediately after the [plaintiff] was backing up towards him—he would likely be entitled to qualified immunity."); *see also Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

But by the time Officer Guajardo fired shots 4–6, and Officer Cantu fired shots 7–9, Mr. Estevis had driven away from all the officers and was stopped against a

fence (*see, e.g.*, Dkt. No. 66-3 at 5:18:40–50). No one was in the path of the truck. Mr. Estevis may have revved the engine, and the wheels may have spun, but the truck did not move (Dkt. No. 66-7 at 5:23:00–04). Further, the engine stopped revving just before the officers fired shots 4–9 (*id.*; *see* Dkt. No. 66-3 at 5:18:40–50).

Most importantly, Officer Guajardo *advanced on the truck* from the side for five seconds, with his gun drawn, and took careful aim before firing at Mr. Estevis (*see* Dkt. Nos. 66-2 at 5:18:40–46; 66-5 at 5:18:40–46). Officer Cantu similarly advanced on the truck, before retreating as he fired shots 7–9 (*see* Dkt. No. 66-3 at 5:18:42–50). Officer Cantu testified in his deposition that he did not think Mr. Estevis' truck presented a threat when it was going forward, and that it ceased to be a threat once the engine stopped revving and the tires stopped spinning (Dkt. No. 66-15 at 33, 35–36). This is a far cry from cases in which suspects drove at an officer and forced the officer to make a split-second decision in defense of his life or the lives of others. *See, e.g., Hathaway v. Bazany*, 507 F.3d 312, 321–22 (5th Cir. 2007) (officer acted reasonably in shooting driver of car that accelerated towards him and hit him, given brief window officer had to respond to the car moving towards him). Here, no officer was in the vehicle's immediate path, and the Defendant officers were standing to the side of the truck, which was already stalled in the grass and incapacitated from spike strips. *See id.* at 321 ("Cases addressing suspects fleeing in motor vehicles often focus on the position of the officer relative to the vehicle."). Further, as Officer Guajardo testified in his deposition, Mr. Estevis "did not have a firearm at that point, not that we knew of" (Dkt. No. 55-2 at 19).

Under these circumstances, the Court cannot find that Mr. Estevis posed a serious enough threat of harm to the officers to justify the use of deadly force. For about fifteen minutes prior to the shooting, Mr. Estevis' truck had been reduced to a jogging pace (*see*, *e.g.*, Dkt. No. 66-5 at 5:16:07–5:18:28). Thus, even if the truck had not stalled against the fence, it could not have done much damage had it reversed. All the other officers on scene had taken cover behind their vehicles, affording them additional protection against the incapacitated truck.

The events also did not unfold in a flash—rather, eight seconds passed between the truck reversing into Officer Guajardo's car and shots 4–6, and ten seconds passed between the collision and shots 7–9 (*see* Dkt. Nos. 66-2 at 5:18:34–50, 66-5 at 5:18:34–50). This was enough time for the officers to recognize that the stalled truck no longer presented the same threat of harm that it may have presented when it reversed into Officer Guajardo's car. *See Lytle*, 560 F.3d at 414 (three to ten second interval between suspect reversing towards officer and driving away was sufficient time for officer to perceive threat to him had passed); *Roque*, 993 F.3d at 333 ("An exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.") (quoting *Lytle*, 560 F.3d at 413).

Thus, the Court finds that the second *Graham* factor tilts in favor of Officer Guajardo for shots 1–3 but strongly against the Defendant Officers for shots 4–9.

c.  Third *Graham* Factor

The third *Graham* factor is whether the suspect is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. The Court has little difficulty

concluding that Mr. Estevis was indeed attempting to evade arrest. Although he may have stopped revving the truck engine a second before shots 4–6 (*see* Dkt. Nos. 66-2 at 5:18:42–49; 66-7 at 5:23:00–10), that was not a clear signal that he was giving up on his two-hour flight from law enforcement. Thus, the third *Graham* factor tilts in favor of the officers.

"The inquiry described by the [U.S. Supreme] Court is situation specific. Among relevant considerations: Were the lives and well-being of others (motorists, pedestrians, police officers) at risk? Was there a safer way, given the time, place, and circumstances, to stop the fleeing vehicle?" *Scott*, 550 U.S. at 386 (Ginsburg, J., concurring) (cleaned up). Given the minimal risk Mr. Estevis presented, the circumstances here cried out for a safer approach. Police Chief Claudio Trevino, Jr., was asked in his deposition whether he would have told Officers Guajardo and Cantu to shoot if he had known the situation in advance (Dkt. No. 55-4 at 33). He responded: "I wouldn't say that's what I would tell them. I would . . . send a message of slowing things down. Maybe back off, take a more defensive position." (*id.*).

The Court agrees—Officers Guajardo and Cantu had more defensive options at their disposal than the course of action they took. They did not have to advance on Mr. Estevis and shoot him as he sat in his disabled truck, stalled against the fence. Mr. Estevis no longer presented a serious enough threat to anyone's life to justify the use of deadly force.

To some degree, the officers seem to have known this. When LPD conducted an internal investigation of the events at issue here, Officer Cantu acknowledged

that, after the spike strips slowed the truck down, Mr. Estevis "was not a threat to [him], the public or any officer" (Dkt. Nos. 66-19 at 9; 66-23). Officer Cantu reaffirmed this view in his deposition:

> "Q.     So do you agree . . . that at [the time of the interception] the suspect was not a threat to you, the public, or any officer?
>
> A.     Correct."

(*see* Dkt. No. 66-15 at 26).

In Officer Guajardo's internal affairs interview with LPD, he also agreed that, after the truck's tires were incapacitated, Mr. Estevis was not a threat to officers (*see* Dkt. No. 66-21). The proposition the officers make is that when Officer Cantu "erroneously" drove Mr. Estevis off the road, the calculus somehow changed (Dkt. No. 66-19 at 9–10). But if anything, when the truck stalled in the grass, surrounded by a fence and a wall of police vehicles, it presented less of a threat than it did before Officer Cantu drove it off the road.

The shooting here was the culmination of a series of wrongful events: (1) officers continued the chase in violation of their superiors' orders to call it off; (2) Officer Cantu drove Mr. Estevis off the road in a manner that he was not trained in, commanded to perform, or authorized to execute; and (3) the officers shot Mr. Estevis while his disabled truck was stalled in the grass against a fence and fully boxed in by police vehicles.

Guided by the *Graham* factors, the Court finds that Officer Guajardo's shots at Mr. Estevis' truck immediately after it reversed into his squad car (shots 1–3) did not constitute excessive force. The Court will not second-guess Officer Guajardo's

perception that Mr. Estevis presented a serious threat of harm at that moment. However, viewing the facts in the light most favorable to Mr. Estevis, the shots Officers Guajardo and Cantu fired at his truck after it stalled in the grass on the side of the road (shots 4–9) constituted excessive force in violation of the Fourth Amendment. A genuine dispute of material fact exists as to whether shooting Mr. Estevis at that time was excessive in proportion to the threat he presented. The remaining inquiry is whether the officers' conduct violated Mr. Estevis' clearly established rights.

### ii.    Clearly Established Right

A government official violated a clearly established right if that right was delineated by "controlling authority—or a robust consensus of cases of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (cleaned up, citation omitted). The clearly established prong of qualified immunity analysis is hard to overcome—existing precedent must have placed the constitutional question "beyond debate," and courts must not "define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). The constitutional right "must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right." *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998).

> The central concept [in clearly established analysis] is that of "fair warning": The law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before

the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others. This holds as both a general matter, and in the more specific context of shooting a suspect fleeing in a motor vehicle.

*Lytle*, 560 F.3d at 417–18 (citations omitted).

In *Lytle*, a police officer shot at a suspect who was fleeing in his car and instead hit a fifteen-year-old girl who was sitting in the backseat.[10] 560 F.3d at 417–18. The suspect had reversed towards the officer, but then drove away. *Id.* at 409. According to the plaintiff, the suspect was three to four houses away when the officer fired at the car. *Id.* The court reasoned that, while the officer would likely have been justified in shooting at the car as it backed up towards him, that did not mean that it was reasonable for him to shoot as it drove away. *Id.* The three to ten seconds that may have elapsed between the car reversing towards the officer and then driving three to four houses away meant "that sufficient time might have passed for [the officer] to perceive that the threat to him had ceased." *Id.* at 414. Accepting the plaintiff's version of the facts as true, the Fifth Circuit held that a jury could find the officer used excessive force in violation of the Fourth Amendment. *Id.* at 417.

*Lytle* guides the Court's analysis. As in *Lytle*, the officers here shot at a vehicle that had driven away from them, after enough time had elapsed for the officers to

---

[10] The police shooting the girl instead of the suspect was not significant to the court's analysis.

realize that the vehicle no longer posed a threat of death or serious bodily harm. Here, eight seconds elapsed between Mr. Estevis reversing into Officer Guajardo's truck and Officer Guajardo firing his second set of shots (*see* Dkt. Nos. 66-2 at 5:18:34–48; 66-5 at 5:18:34–48). Two more seconds elapsed before Officer Cantu fired at Mr. Estevis (*see* Dkt. No. 66-3 at 5:18:40–50). During that time, the severely disabled truck drove off the road, away from the officers, where it revved in the grass and remained immobile (*see* Dkt. Nos. 66-3 at 5:18:40–50; 66-7 at 5:23:00–04). *Lytle* clearly establishes that the officers had enough time to perceive that the incapacitated truck, when it drove away from them, presented an insufficient threat of harm to justify using deadly force. *See Edwards v. Oliver*, 31 F.4th 925, 930–31 (5th Cir. 2021) ("Our precedent in *Lytle v. Bexar County* holds that the use of deadly force against a fleeing suspect who poses insufficient harm to others violates clearly established law.") (citing *Lytle,* 560 F.3d at 417–18).

A robust consensus of persuasive authority from other circuits also supports the conclusion that Officers Guajardo and Cantu violated Mr. Estevis' clearly established rights. Circuit courts of appeal have consistently denied qualified immunity where officers fired into the side or rear of cars that were moving away from them. *See Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) (denial of summary judgment proper where, under plaintiff's version of the facts, officer shot at slow-moving vehicle from the side); *Abraham v. Raso*, 183 F.3d 279, 299 (3d Cir. 1999) (reversing grant of summary judgment for defendant officer who, under plaintiff's version of the facts, fired at suspect's car from the side);

*Waterman v. Batton*, 393 F.3d 471, 482 (4th Cir. 2005) (officers engaged in excessive force when they fired at slow-moving vehicle after it drove past them); *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005) (denying qualified immunity where, under plaintiff's version of the facts, officer ran towards stolen police car and fired into the driver's side window after the car passed him); *Orn v. City of Tacoma*, 949 F.3d 1167, 1174–77 (9th Cir. 2020) (officer who fired into side of slow-moving car lacked objectively reasonable basis to believe suspect posed threat of serious physical harm to the officer or others); *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) (jury could find use of force excessive and general threat to public insufficient where, construing facts in plaintiff's favor, officer fired fatal shot into side of truck as it passed him); *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (denying summary judgment where officers allegedly shot into side of suspect's fleeing truck while driving parallel to it).

Further, under the principle of fair warning, this case arguably presents much stronger facts than *Lytle*. In *Lytle*, the suspect fled in a fully mobile car and "the chase took place at high speeds within a residential area, there were children playing somewhere nearby, and the [suspect's car] had collided with another vehicle." 560 F.3d at 416. By contrast, the chase here culminated at 5:18 a.m. on a street without much traffic, except for the several police cars surrounding Mr. Estevis' truck. Far from being high speed, the chase was proceeding at a jogging pace of three to five miles per hour. Mr. Estevis' truck was so severely disabled that it was unable to move after driving onto the grass. *Lytle* thus gave more than fair warning to the officers

that shooting at the truck in these circumstances would violate clearly established law, meaning their conduct was objectively unreasonable.

For the foregoing reasons, Officer Guajardo and Officer Cantu's motion for summary judgment (Dkt. No. 54 at 16) is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion for summary judgment is **GRANTED** as to the first three shots Officer Guajardo fired at Mr. Estevis (shots 1–3). However, their motion is **DENIED** as to the last six shots the officers fired at Mr. Estevis (shots 4–9).

### B. Claims Against City of Laredo

Mr. Estevis also claims that Defendant City of Laredo caused Officers Guajardo and Cantu to engage in excessive force through its policies, practices, and customs (Dkt. No. 29 at 14). In this vein, Mr. Estevis claims that the City:

(a) had a policy and/or practice of using excessive deadly force and shooting at harmless occupants of vehicles;
(b) promulgated its policies with deliberate indifference to Mr. Estevis' Fourth and Fourteenth Amendment rights;
(c) failed to adequately train and supervise its officers;
(d) ratified the unconstitutional conduct here; and
(e) fabricated evidence to justify the shooting and press false charges against Mr. Estevis.

(*id.* at 14–15; Dkt. No. 66 at 16).

Pursuant to *Monell v. Dep't of Soc. Servs. Of N.Y.C.*, a municipality is not liable for "an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978).[11] Rather, "it is when execution of a government's policy or custom, whether made by

---

[11] *See also City of Canton, Ohio v. Harris*, 489 U.S. 379, 387 (1989) ("Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply [a constitutional] policy in an unconstitutional manner, for liability would then rest on *respondeat superior*.").

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government . . . is responsible under § 1983." *Id.*

"Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citation omitted). The "moving force" requirement means that there must be a direct causal link between the policy and the violation. *See Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). The Fifth Circuit has established three ways to show an official policy or custom:

> First, a plaintiff can show "written policy statements, ordinances, or regulations."
>
> Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."
>
> Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019) (citations omitted).

Here, Mr. Estevis has not alleged the City's policies are facially defective; rather, he claims a pattern of prior incidents put the City on notice that it had deficient policies, and the City failed to take corrective action (Dkt. Nos. 29 at 15; 66 at 47). But in the absence of any facial issue with Laredo's policy, Mr. Estevis must establish that "the policy was promulgated or implemented with deliberate

indifference to the known or obvious consequences that constitutional violations would result." *See Covington v. City of Madisonville*, 812 F. App'x 219, 225 (5th Cir. 2020) (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018)) (internal quotation marks omitted).

Direct causation and deliberate indifference are "rigorous requirements," necessary to prevent "municipal liability collaps[ing] into *respondeat superior* liability." *See Bd. Of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997); *see also id.* at 407 ("A showing of simple or even heightened negligence will not suffice."); *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 461 (5th Cir. 2000) ("In short, the evidence must establish, under the stringent standards of the Supreme Court's pronouncements in *Bryan County*, unmistakable culpability and clearly connected causation.").

> Deliberate indifference is a high standard that requires a complete disregard of the risk that a violation of a particular constitutional right would follow the decision. To show deliberate indifference, a plaintiff normally must allege a pattern of similar constitutional violations by untrained employees. A pattern requires *similarity and specificity*; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.

*Edwards v. City of Balch Springs, Texas*, 70 F.4th 302, 312 (5th Cir. 2023) (cleaned up, citations omitted) (emphasis in original).

### i.    *Official Policy or Custom*

Mr. Estevis has alleged that eight prior shooting incidents stretching back to 2008 establish a *Monell* custom, because the shootings reflect a "widespread pattern 'so persistent as to practically have the force of law.'" (Dkt. No. 66 at 48) (quoting

*Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017)). The threshold question before the Court, therefore, is whether these eight prior shootings represent an official policy by virtue of being "so common and well-settled as to constitute a custom that fairly represents municipal policy." *See Webb*, 925 F.3d at 215.[12] For the reasons that follow, they do not.

Mr. Estevis devotes significant attention to the past shootings, concluding that "over 60% of LPD's shootings at vehicles were unjustified in the ten years before Estevis was shot" (Dkt. No. 66 at 20). However, these prior incidents, as detailed in the extensive exhibits, do not demonstrate that these "cases within [the case]" form a pattern of illegality. *See Pineda*, 291 F.3d at 329 (5th Cir. 2002).

First, only one of these prior shootings was found to be unlawful. In that incident, which took place on May 26, 2012, Officer Frank Carter fired at a car in a parking lot as it drove away from him, and later beat a handcuffed arrestee who was seated in the back of a police car (Dkt. No. 66-65 at 3, 7). The incident arose when Officer Carter, off-duty, approached an SUV parked outside a McDonald's restaurant and attempted to detain the occupants, allegedly at the restaurant manager's behest (*id.* at 10). Officer Carter asserted that the driver responded with obscenities and drove away (*id.*). He claimed that the car dragged him "for a few feet" as it drove away, but LPD's investigation of the incident found this claim to be false (*id.* at 4–5, 10) ("At no time is Officer Carter seen falling or being dragged."). When the car was

---

[12] *See also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) ("A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct.").

about 30 feet away, Officer Carter drew his gun and fired one shot, which hit the SUV's rear door and lodged in the right rear passenger door panel, injuring no one (*id.* at 3–5). When officers later apprehended the driver, handcuffed him, and placed him in the back of a patrol car, Officer Carter "repeatedly punched him on his back shoulder, grabbed his hair and repeatedly struck it against the seat" (*id.* at 27).[13] He also hit the handcuffed female passenger on the face (*id.*).

In consequence for this conduct, the LPD sustained multiple complaints against Officer Carter for use of force, treatment of prisoners, excessive force, conduct unbecoming, demeanor, and truthfulness (*id.* at 27). A criminal information was filed against him, and Officer Carter resigned the same day (*see* Dkt. Nos. 66-61–62). He then pleaded guilty in federal court to one count of deprivation of rights under color of law in violation of 18 U.S.C. § 242 (Dkt. No. 66-67 at 2).

The remaining prior shootings are summarized in the following table:

| Dkt. No(s). | Date | Officer(s) | Suspect |
|---|---|---|---|
| 66-53–54 | Sept. 5, 2008 | Officer Juan Rivera | Ramiro Gonzalez |
| Officer Rivera fired at a fleeing suspect in a truck after the truck dragged him and another officer in reverse (Dkt. No. 66-54 at 2). Officer Rivera fired one shot into the truck's radiator (*id.* at 21). The Chief of Police found the shooting to be justified (Dkt. No. 66-53 at 5–6). | | | |
| 66-55 | Apr. 6, 2009 | Sergeant Hector Garcia, Officer Rene Rodriguez | Amador Chapa-Rodriguez |
| Suspect fled in a high-speed chase on the freeway, reaching speeds of about 105 m.p.h. before colliding with a police car (Dkt. No. 66-55 at 5). Sergeant Garcia, who was not in the struck car, exited his car and immediately shot at the suspect's truck (*id.*). The LPD rejected Sergeant Garcia's claim that he shot because he was in "imminent danger of being run over" by the suspect, finding that he was not directly | | | |

---

[13] Officer Carter admitted to punching the driver (Dkt. No. 66-65 at 25).

in front of the truck and that he even took cover against it (*id.*). The Firearms Review Board recommended "over 180 days [suspension]" and the Chief of Police concurred (*id.* at 6).

| 66-56–59 | May 21, 2010 | Officer Frank Carter | Gabriel Camacho |

Suspect was fleeing a police pursuit when he came near a construction site where Officer Carter was working off duty directing traffic (Dkt. No. 57 at 11). Officer Carter dove out of the way of the car and shot at it (*id.*). The bullet hit the left rear quarter panel, injuring no one (*id.* at 6). The Chief of Police reviewed the shooting and exonerated Officer Carter (Dkt. No. 66-56 at 6).

| 66-68–71 | June 30, 2013 | Officer Richard Garza | Austin Flores |

While police were pursuing a suspect driver, Officer Garza stood in the middle of the road and shot at the suspect's oncoming car seven times (Dkt. No. 66-68 at 6). LPD found this put police cars behind the suspect's car in potential danger of crossfire (*id.* at 7). Later, the suspect's car, disabled, pulled over to the curb at a slow speed and stopped (Dkt. No. 66-69 at 7). Officer Garza exited his patrol car and shot at the suspect's car twice when he noticed the car rock backwards, even though another officer was attempting to approach the car with a dog to arrest the suspect (*id.*; Dkt. No. 66-70 at 5). Officer Garza claimed to only be attempting to shoot at the suspect's car's tires (Dkt. No. 66-69 at 7).

LPD found that this conduct violated their policy and imposed a 3-day suspension (Dkt. No. 66-68 at 2, 7–8).

| 66-72–77 | Nov. 17, 2014 | Officer Juan Leal | Jorge Mendoza-Gonzalez |

Officer Leal engaged in a nighttime chase of a Buick which stopped in an unpaved area (Dkt. No. 66-72 at 2). The driver fled on foot, and Officer Leal chased him (*id.*). A passenger in the Buick then turned on the car's ignition and began to drive into the field where Officer Leal was chasing the other suspect (*id.* at 2–3). Officer Leal said the Buick accelerated towards him and he shot the driver once, hitting him in the head (*id.* at 3; Dkt. No. 66-75 at 2). The LPD found Officer Leal's shot justified to prevent the driver from running him over (Dkt. No. 66-73 at 13). However, Officer Leal's shot hit the driver in the back of the head, contradicting the notion that he shot while the driver bore down on him (Dkt. Nos. 66-75 at 2, 66-77 at 49–50). In his deposition, Deputy Chief Ricardo Gonzalez testified that Officer Leal was not in front of the Buick when he fired, but that the Buick was nevertheless driving into the open field where several other officers were looking in the dark for the suspect who fled on foot (Dkt. No. 66-43 at 61–63).

| 66-78–88 | Nov. 9, 2015 | Officer Priscilla Hernandez | Cesar Cuellar, Jr. |

Officer Hernandez and her partner were dispatched to a call of attempted suicide (Dkt. No. 66-78 at 8). The subject of the report, Cuellar, Jr., was a Webb County Sheriff's Deputy (*id.*). The officers ascertained that Cuellar had a gun and was locked in his room (*id.* at 8–9). They told him to put the gun down and come out of

the room. He came out with the gun by his side (*id.* at 9). The officers said they then shot him because he raised the gun (*id.*). Cuellar's mother, who had arrived at the apartment just after the officers, said that her son never moved the gun (*id.*).

In a subsequent § 1983 claim brought by Cuellar's mother, United States District Judge Diana Saldaña found that the plaintiff presented a genuine dispute of material fact as to whether Officer Hernandez used excessive force, but that the constitutional violation was not clearly established, thus upholding Officer Hernandez's assertion of qualified immunity (*id.* at 23).

| 66–89–92 | Dec. 8, 2017 | Officer Miguel Herrero | Jose Habib Avila |
|---|---|---|---|

Officer Herrero was working off-duty at a hotel when he was informed that Mr. Avila was creating a disturbance outside a motel room his girlfriend was staying in (Dkt. No. 66-89 at 6). Officer Herrero told Mr. Avila, who was in his truck, to leave the premises, but Mr. Avila refused (*id.*). Officer Herrero reached into Mr. Avila's truck to grab his arm and detain him (*id.*). Mr. Avila started to drive away while Officer Herrero's body was partially inside the cabin (*id.*). Officer Herrero fired two shots, hitting the truck in the left rear passenger door (*id.*). Mr. Avila was not hit, and Officer Herrero was not injured (*id.*).

The Firearms Review Board said no further action was necessary but recommended that Officer Herrero retrain and practice his firearm handling skills (Dkt. No. 66-89 at 8). Chief Trevino concurred with the recommendation (*id.*).

As detailed above, many of the prior shootings involved situations where officers fired at suspects who presented an immediate threat in fully mobile vehicles (*see* Dkt. Nos. 66-54; 66-56–59; 66-72–77; 66-89–92). These cases do not present a clear inference of illegality because they bear little resemblance to the shooting of Mr. Estevis, who posed only a minimal threat in his severely disabled truck. Further, in the two cases where evidence suggested that the suspect drivers may not have been an immediate threat, the LPD disciplined the officers who shot at the suspects (*see* Dkt. Nos. 66-55 at 6; 66-68 at 7–8). Even assuming *arguendo* that the shootings of Amador Chapa-Rodriguez and Austin Flores were unlawful, the fact that LPD disciplined these officers for the shootings undermines Mr. Estevis' claim that the

City was deliberately indifferent "to the known or obvious consequences that constitutional violations would result." *Alvarez*, 904 F.3d at 390 (quoting *Bryan Cnty.*, 520 U.S. at 407).

Lastly, the shooting of Cesar Cuellar, Jr., in which United States District Judge Diana Saldaña found Officer Priscilla Hernandez was entitled to qualified immunity, did not involve a vehicle at all (*see generally* Dkt. Nos. 66-78–88). This cannot satisfy the "similarity and specificity" required of past incidents in a pattern and practice claim. *See Edwards*, 70 F.4th at 312.

Therefore, as to the threshold question of whether these prior shootings demonstrate a pattern of unlawful conduct "so common and well-settled as to constitute a custom that fairly represents municipal policy," these incidents are insufficient. *See Webb*, 925 F.3d at 215 (citation omitted). In making the bold claim that the City of Laredo has a well-settled practice of unlawfully shooting drivers, Mr. Estevis must surely demonstrate more than one confirmed prior unlawful shooting at a driver, and a few shootings of debatable lawfulness. *See Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy.") (citation omitted).

Even if all eight incidents Mr. Estevis alleges were clear-cut uses of excessive force against drivers, that still would likely not establish a *Monell* custom, especially given that they took place over more than nine years. A pattern requires "sufficiently numerous prior incidents." *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850–51 (5th Cir. 2009) (district court did not err in finding twenty-seven excessive force

complaints during a four-year period insufficient to establish a pattern); *see also Pineda*, 291 F.3d at 329 (eleven incidents of alleged Fourth Amendment violations insufficient for pattern claim); *see also Elkahiny v. Bexar Cnty., Tex.*, No. SA-20-CV-00100-OLG, 2022 WL 2840457, at *6 (W.D. Tex. June 22, 2022) (six similar incidents of excessive force in three years did not establish a pattern); *see also Alanis v. City of Brownsville*, No. 1:16-cv-190, 2018 WL 11183788, at *16 (S.D. Tex. June 7, 2018), *report and recommendation adopted*, 2018 WL 11183821 (S.D. Tex. July 24, 2018) (six confirmed instances of excessive force and nine debated incidents, taking place over nine years, insufficient to establish a pattern).

Mr. Estevis' argument also fails on the "moving force" prong of his municipal liability claim, for which he must show a direct causal link between the City's alleged deliberate indifference and the shooting here. *See Piotrowski*, 237 F.3d at 580. That is because Chief Trevino, who became Police Chief in May 2017, instituted new trainings in response to some of the past shootings (*see* Dkt. No. 55-4 at 6, 31). He testified as follows in his deposition:

> Q. Okay. And did any of those changes in policies and trainings, were they specific to shootings?
>
> A. It related as a whole -- in the whole scope. I saw the numbers of shootings taking place and then I saw the need to have better training and better equipment. Like we mentioned earlier in the conversation, about slowing things down, allowing the officers to be in a safe position while attempting to create that -- or have that deescalation process available. Because if the threat continues and they see themselves . . . in a threatening situation, I didn't want that to be an issue for them not . . . having that deescalation. So we brought in trainings, shields, helmets, those type of things to be able to better allow the officers to slow things down.

(*id.* at 31).

Far from suggesting he was deliberately indifferent to the risk that constitutional violations might occur, Chief Trevino's testimony demonstrates he took meaningful steps on the City's behalf to ensure officers were trained in de-escalatory tactics that might prevent unlawful shootings. Because the City's deliberate indifference must have caused the instant violation, the City's new de-escalatory trainings, instituted after the prior shootings Mr. Estevis complains of, severely undermine his claim.

Trying another tack, Mr. Estevis also argues that LPD allows officers to deactivate their body-worn cameras after shootings to confer with each other, as he alleges Officers Guajardo and Cantu did here (Dkt. No. 66 at 57). He argues that this risked creating "a culture of officers covering up misconduct by coordinating with their colleagues" (*id.*). Though claiming this is part of a "widely accepted custom" of cover-up culture, Mr. Estevis fails to identify other instances in which officers have deactivated their body-worn cameras after a shooting, and thus does not establish a pattern of these incidents. Nor does he demonstrate that a final policymaker was aware of this alleged conduct. As for causation, without pointing to prior incidents of officers deactivating their body-worn cameras, Mr. Estevis cannot logically argue that Officers Guajardo and Cantu deactivating their body-worn cameras and conferring after the shooting caused the shooting. Therefore, this claim fails.

Mr. Estevis makes a similarly unsupported argument about a cover-up culture stemming from the City of Laredo's policy providing for a 72-hour waiting period before internal investigators can interview officers involved in shootings, during

34

which time the officers can confer with counsel (*see* Dkt. Nos. 66 at 57–58; 66-50 at 5; 55-9 at 13–14). Mr. Estevis alleges this is "further evidence of deliberate indifference to the obvious consequence: that more excessive force will be inflicted on people like Estevis" (Dkt. No. 66 at 57–58). He does not argue that this policy is facially unconstitutional; nor does it appear to be. What remains is for Mr. Estevis to allege a pattern of prior instances of this policy leading to unlawful results. Mr. Estevis makes no attempt to do so, and thus this claim also comes up short. The City's policy appears to provide a reasonable period of time in which officers can gather their thoughts after a potentially traumatizing shooting incident and speak with their attorneys before making a formal statement.

Thus, Mr. Estevis' evidence is not compelling enough to clear the high bar for a pattern and practice claim against the City of Laredo. As he is unable to demonstrate a genuine dispute of material fact on this issue, the Court now turns to his other claims against the City—that it failed to train and supervise its officers, and that it ratified the unconstitutional conduct here.

### ii. *Failure to Train or Supervise*

Mr. Estevis alleges that the City of Laredo failed to adequately train its officers in the use of deadly force and de-escalatory tactics, and failed to adequately supervise its officers during police pursuits (Dkt. No. 29 at 14). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. "The standard applicable to a failure-to-train

claim is the same as the standard for municipal liability." *Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) (citation omitted). "In order to establish the City's liability . . . plaintiffs must show (1) inadequate training procedures; (2) that inadequate training caused . . . officers to shoot . . . and (3) the deliberate indifference of municipal policymakers." *Pineda*, 291 F.3d at 331–32. "[F]or liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective." *Edwards*, 70 F.4th at 312 (quoting *Trammell v. Fruge*, 868 F.3d 332, 345 (5th Cir. 2017)).

Mr. Estevis' claim fails because, as described in the previous section, he cannot establish the City's deliberate indifference. Nor does he allege with specificity how the City of Laredo's training program was defective. Rather, he suggests that the City acted with deliberate indifference because it made no changes to its training after past shootings (Dkt. No. 66 at 56). But as discussed, this is not so because Chief Trevino instituted new de-escalatory trainings in 2017 after becoming Chief of Police (Dkt. No. 55-4 at 31). *See Valle*, 613 F.3d at 548 ("[I]t is difficult to show deliberate indifference in a case . . . where the City has implemented at least some training."). Thus, Mr. Estevis has not alleged that training procedures were inadequate in sufficient detail, and cannot establish a causal link between any training procedures and the instant shooting. His failure to train claim does not hold water.

Mr. Estevis' failure to supervise claim is even less supported. He alleged in his complaint that the City is liable for failing to "adequately supervise officers during police vehicle pursuits" (Dkt. No. 29 at 14). But he did not expand upon this argument

further in his complaint, and does not address it in his response or sur-reply to Defendants' motion for summary judgment. Failure to supervise claims are held to the same high standard of deliberate indifference, so this threadbare allegation will not suffice. *See Peterson*, 588 F.3d at 850; *Zarnow*, 614 F.3d at 169 ("To support a supervisory liability claim, the misconduct of a subordinate must be conclusively linked to the action or inaction of the supervisor."). A significant aspect of the misconduct in this case was the officers' failure to follow their supervisors' orders, rather than a failure of the supervisors (*see* Dkt. Nos. 66-18 at 11, 66-19 at 8–9).

       *iii.*    *Ratification*

Mr. Estevis argues the City is liable for ratifying unconstitutional conduct because it "took the position that, in spite of the video evidence, the shooting was correct, it agrees with all of Guajardo and Cantu's choices, and the City would expect any other Laredo Police Department officer put in their shoes in the future to do the same thing" (Dkt. No. 66 at 55) (internal quotation marks omitted). Mr. Estevis further argues that the City is liable for "tolerating Guajardo, Cantu, and the half-dozen other officers' inaccurate statements about the shooting as adhering to City of Laredo policy" (*id.* at 56). Mr. Estevis says the City knew that the officers' statements would form the basis of the officers' testimony before a grand jury "that ultimately falsely charged Estevis with reversing towards officers" (*id.*).

A municipality may be held liable for ratifying officers' unconstitutional conduct only in "extreme factual situations." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017) (citation omitted). Importantly, a policymaker is not

necessarily liable for defending conduct later found to be unlawful. *Peterson*, 588 F.3d at 848 (citation omitted). In *Peterson*, the Fifth Circuit pointed to *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), to demonstrate what constitutes an extreme factual situation. *Peterson*, 588 F.3d at 848. In *Grandstaff*, the entire night shift of the city's police force pursued a fleeing suspect onto the ranch of an innocent third party and, "without awaiting any hostile act or sound," "poured" gunfire onto a truck in a "wild barrage" and killed its innocent occupant. 767 F.2d at 166, 168, 170–72. The Fifth Circuit found ratification given that the City denied any failure and "concerned [itself] only with unworthy, if not despicable, means to avoid legal liability." *Id.* at 166. By contrast, the *Peterson* court noted that no extreme factual situation was presented in a prior case where an officer unconstitutionally shot a fleeing suspect in the back. *See* 588 F.3d at 848 (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998)).

The facts here do not present an extreme factual situation as in *Grandstaff*. The officers' use of force, though excessive under the facts viewed in the light most favorable to Mr. Estevis, was not "manifestly indefensible." *See Covington*, 812 F. App'x at 228. The Court's finding that the shooting was potentially unconstitutional does not compel it to conclude otherwise. *See Davidson*, 848 F.3d at 395–96 ("Here, the underlying conduct by [the officers], while unconstitutional, was not sufficiently extreme to qualify for a finding of ratification.").

As for the allegedly false grand jury charges, the Court will not speculate on whether the officers perjured themselves in secret grand jury proceedings. *See*

*generally Shields v. Twiss*, 389 F.3d 142, 147 (5th Cir. 2004) (noting the general rule of secrecy surrounding grand jury proceedings); *see also* Fed. R. Crim. P. 6(e). The grand jury's indictment, finding probable cause that Mr. Estevis reversed "in the direction of officers," was justified based on the facts (*see* Dkt. No. 66-41 at 2). Mr. Estevis reversed into Officer Guajardo's car while Officer Guajardo stood just behind the car. And of course, a grand jury's indictment is not a basis for the City's liability.

Mr. Estevis' claim that the police reports about this event were "fabricated" to justify the shooting is similarly flimsy (*see* Dkt. No. 66 at 16–17). The officers' claims, for instance, that Mr. Estevis almost ran over Officer Guajardo, or that the officers shot Mr. Estevis while he was revving his engine, involve a fair interpretation of the facts from the officers' points-of-view (*see id.*). Mr. Estevis contests the LPD's characterization, in its draft internal affairs summary of the incident, that Mr. Estevis "recklessly reversed his vehicle onto other law enforcement personnel," and the LPD's conclusion that the shooting was justified (Dkt. No. 66-46 at 38, 40). But given that he is not claiming the internal affairs summary violated his rights, Mr. Estevis' complaint, for ratification purposes, amounts to nothing more than a complaint that supervisors defended conduct later found to be unlawful. To reiterate, this cannot serve as a basis for municipal liability. *See Peterson*, 588 F.3d at 848; *Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir. 1986).

In summary, Mr. Estevis' claims against the City of Laredo do not suffice to create a genuine dispute of material fact as to the City's liability. The Court therefore **GRANTS** the City's motion for summary judgment (Dkt. No. 54 at 12).

## V.    CONCLUSION

Police officers perform their duties under difficult circumstances, and courts should give them wide berth when interpreting their actions after the fact. However, accepting Mr. Estevis' version of the facts as true, he has presented a genuine dispute of material fact as to whether the Defendant Officers engaged in excessive force when they shot him, and a jury must resolve the dispute. Officer Guajardo is entitled to qualified immunity as to the first three shots he fired at Mr. Estevis, immediately after Mr. Estevis reversed into Officer Guajardo's car. Thus, his motion for summary judgment (Dkt. No. 54) is **GRANTED IN PART**, as to the first three shots (shots 1–3). Officers Guajardo and Cantu are not entitled to qualified immunity for the last six shots they fired at Mr. Estevis, and their motion for summary judgment (Dkt. No. 54) is **DENIED IN PART** as to these shots (shots 4–9). Mr. Estevis has established no genuine dispute of material fact as to the City's liability, so its motion for summary judgment (Dkt. No. 54) is **GRANTED**. The Clerk of Court is **DIRECTED** to **TERMINATE** Defendant City of Laredo from this action. Mr. Estevis' claims against the Defendant Officers remain pending to the extent described above.

It is so **ORDERED**.

**SIGNED** March 27, 2024.

Marina Garcia Marmolejo
United States District Judge

40